748 A.2d 1027

**Terry Elizabeth MUSSER**

v.

**Barbara Marie CHRISTIE.**

**No. 1736, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 29, 2000.

Stephen L. Prevas (Prevas and Prevas, on the brief), Baltimore, for appellant.

Monica L. Scherer (George Psoras, Jr., on the brief), Towson, for appellee.

Argued before HOLLANDER, SALMON and BYRNES, JJ.

SALMON, Judge.

In a domestic violence case, a Maryland judge may only grant a protective order if (1) the court finds by clear and convincing evidence that abuse has occurred or (2) the respondent consents to the protective order. *See* Md.Code Ann., Fam. Law ("FL") § 4–506(c)(ii) (1999 Repl.Vol., Supp.1999). Here, a protective order was issued without the consent of the respondent, Terry Musser ("Ms. Musser"). Whether the order should have been signed hinges upon the meaning of the word "abuse," within the context of the statute.

FL section 4–501(a) and (b) reads:

(a) *In general.*—In this subtitle the following words have the meanings indicated.

(b) *Abuse.*—(1) "Abuse" means any of the following acts:

(i) an act that causes serious bodily harm;

(ii) an act that places a person eligible for relief in fear of imminent serious bodily harm;

(iii) assault in any degree;

(iv) rape or sexual offense as defined by Article 27, §§ 462 through 464C of the Code or attempted rape or sexual offense in any degree; or

(v) false imprisonment.

(2) If the person for whom relief is sought is a child, "abuse" may also include abuse of a child, as defined in Title 5, Subtitle 7 of this article. Nothing in this subtitle shall be construed to prohibit reasonable punishment, including reasonable corporal punishment, in light of the age and condition of the child, from being performed by a parent or stepparent of the child.

Subtitle 7 of title 5 of FL is entitled "Child Abuse and Neglect." Section 5–701(a) and (b) provides:

(a) *In general.*—In this subtitle the following words have the meanings indicated.

(b) *Abuse.*—"Abuse" means:

(1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed; or

(2) sexual abuse of a child, whether physical injuries are sustained or not.

On August 16, 1999, the trial court found that Ms. Musser had committed "[a]cts which placed [a] Person Eligible for Relief in fear of imminent serious bodily harm." The court identified two grounds for this finding of abuse: (1) Ms. Musser "neglected her child" by leaving the child at the home of Barbara Christie ("Mrs. Christie") for days at a time without keeping in touch with either Mrs. Christie or the child and without letting Mrs. Christie know when she planned to return for the child and (2) by violating the court's *ex parte* order of August 9, 1999, when she arranged for Mrs. Christie to bring the child to her (Ms. Musser's) residence and then refused to allow the child to leave with Mrs. Christie.

Based on its finding of abuse, the trial court, on August 16, 1999, signed a protective order granting Mrs. Christie custody of the child for one year. Ms. Musser filed a timely appeal from the August 16th order and raises several questions.[1] It is necessary, however, to answer only one, *viz:*

---

1. The questions as phrased by Ms. Musser are:
   I. Whether Maryland Code Annotated Family Law article section 4–506 authorized the lower court to award custody of the minor child to a non-parent party?
   II. Whether the lower court erred in entering the protective order herein absent allegation, proof or finding of abuse?
   III. Whether the Circuit Court for Carroll County was without jurisdiction to make a child custody determination in this matter?

Was the evidence sufficient for the trial court to find by clear and convincing evidence that Ms. Musser had abused her child?

## I. *FACTS* [2]

Jessica Marie R. ("Jessica") was born on October 2, 1994. She is the daughter of appellant, Terry Elizabeth Musser. Barbara Marie Christie, the appellee, is Ms. Musser's mother. Prior to August 1999, Jessica lived with her mother, Ms. Musser, on a farm located on Intersection Road, near Glenville, Pennsylvania. Also living at the farm were Jessica's maternal grandfather, James Musser ("Mr. Musser"), and Mr. Musser's current wife.

Mrs. Christie, at all times here relevant, lived with her husband in Westminster, Carroll County, Maryland. On August 4, 1999, five-year-old Jessica called Mrs. Christie and asked if "she could come over and stay" with her. Mrs. Christie consented to the visit, and later that day Ms. Musser delivered Jessica to Mrs. Christie's door. Mrs. Christie asked her daughter (Ms. Musser) to stay, but Ms. Musser declined, saying that she had a "hot date with an Italian stud." Ms. Musser left Jessica in Mrs. Christie's care, and the next day, Thursday, August 5, 1999, Ms. Musser telephoned Mrs. Christie in the evening and talked to her and Jessica. During the phone conversation, Ms. Musser made arrangements with her mother to pick up Jessica on August 6th between 10 and 11 a.m. Ms. Musser did not show up on August 6th, so Mrs. Christie called her ex-husband, Mr. Musser, and asked if he had heard from their daughter. He had not. On August 7th, Mrs. Christie drove to Mr. Musser's farm in Pennsylvania, where Jessica and Ms. Musser usually resided, and left Jessica in the care of Mr. Musser.

On Monday, August 9, 1999, Mrs. Christie drove once again to the farm. She again asked Mr. Musser if their daughter

---

**2.** The facts set forth in this opinion were developed at the August 16, 1999, hearing and are undisputed.

had contacted him. When Mrs. Christie found out that Ms. Musser had not contacted her father, she picked up Jessica and then drove to the Carroll County courthouse, where she filled out a "Petition for Emergency Protective Order." In the petition she named Ms. Musser as the respondent and the "vulnerable person" as Jessica. Mrs. Christie described the "abuse" to which Jessica had been subjected as the abandonment of Jessica to her care, which has already been described. Mrs. Christie also said that Ms. Musser "had done this for a year" and that she (Mrs. Christie) had previously obtained a protective order against Ms. Musser in December 1998. Mrs. Christie asked the court to grant her temporary custody of Jessica.

The circuit court, on August 9, 1999, signed an "*Ex Parte* Order for Protection From Abuse." The order stated that the act that placed the person eligible for relief in fear of imminent serious bodily harm was:

Resp[ondent] has a drug[-]alcohol problem. She dropped 5 year old granddaughter of[f] at Pet[itioner]'s on Aug. 4, 1999, and hasn't been seen since.

The court granted temporary custody of Jessica to Mrs. Christie and ordered, *inter alia,* that Ms. Musser not contact either Jessica or Mrs. Christie.

On August 16, 1999, Ms. Musser appeared at a protective order hearing held in the circuit court. At the hearing, it was undisputed that Ms. Musser left Jessica in Mrs. Christie's care on August 4, 1999, and did not again contact Mrs. Christie until August 10, 1999, which was one day after the *ex parte* order was signed. When Ms. Musser asked her mother, on August 10, 1999, if she could pick up Jessica, Mrs. Christie said "No." Later in the week, however, Mrs. Christie relented and agreed to take Jessica to the farm in Pennsylvania on Saturday, August 14, 1999, so that Jessica and Ms. Musser could visit. Jessica and her mother were reunited at the farm on the 14th, but when Mrs. Christie attempted to leave the farm with Jessica, Ms. Musser refused to let her take Jessica. Mrs. Christie told her daughter that she had an *ex parte* order

giving her temporary custody of Jessica but, nevertheless, Ms. Musser steadfastly refused to allow Jessica to leave. Therefore, Mrs. Christie left the farm alone.

At the August 16th hearing, both Mr. Musser and Mrs. Christie testified that their daughter was an alcoholic. Mrs. Christie told the court that the August 4th incident was the second time that Ms. Musser had left Jessica with her and then "disappeared." The earlier occurrence was the December 1998 incident mentioned in her petition.

Mr. Musser testified that his daughter would go away and leave Jessica in his care at least eight days a month. Despite Ms. Musser's absences, Mr. Musser opined that Jessica had been "very well looked after" by himself, his wife, and Mrs. Christie.

At the August 16th hearing, the court, Mrs. Christie, and Ms. Musser were given copies of a three-page report prepared by Linda Lochner, a licensed clinical social worker ("LCSW") employed by the Carroll County Department of Social Services. In that report, under the heading "Have there been any previous complaints of abuse by respondent in this case on this child/vulnerable adult? If so, list them and the outcome," the following was written:

> [A] neglect investigation was conducted after Terry Musser left her daughter, Jessica [R.], with Barbara Christie, the child's maternal grandmother, and did not return to pick her up. Child neglect of Jessica [R.] was ruled "unsubstantiated," in accordance with the provisions of Family Law Article 5–701(U) and COMAR 07.02.07.13(B).

## II. *DISCUSSION*

The trial judge found two of the definitions of "abuse," which are set forth in the FL article, applicable in this case. By using the definition set forth in FL section 4–501(b)(ii), he found that Ms. Musser had committed "an act that places a person eligible for relief in fear of serious bodily harm." The trial judge said that this finding was based upon "clear and convincing evidence." The court, as mentioned earlier, based

that conclusion on two findings: (1) that Jessica had been "left for days" in Mrs. Christie's care without any contact from the respondent and (2) that Ms. Musser later violated the court's *ex parte* order. Although there was undisputed evidence to support both factual findings, those findings simply do not support the court's ultimate conclusion.

As far as is shown by the evidence, Jessica is an intelligent, healthy child whose alcoholic mother has shifted onto the shoulders of the maternal grandparents a good portion of the work normally associated with the task of raising a child. As irresponsible as her actions were, there was not a scintilla of evidence presented that proved, or even suggested, that *any* act of Ms. Musser placed Jessica "in fear of imminent serious bodily harm."

At the August 16, 1999, hearing, the trial judge asked Ms. Musser a series of questions as to why she had violated his *ex parte* order. In the course of his questioning, he commented:

> [T]here have been three murders in Carroll County involving people who took it upon themselves to violate the [c]ourt's *Ex Parte* or Protective Order. That's what you did.

Appellee suggests that this comment may have enunciated the basis for the court's finding. This, indeed, may have been part of the trial judge's rationale for his decision, but it was not a proper justification. Obviously, no matter what other violators of court orders may have done in Carroll County, those actions can have no impact on the question of whether appellant committed an act of abuse.

The court in its order checked a box on a pre-printed form that indicated that it found "statutory abuse" of Jessica by Ms. Musser. This refers to the definition of "abuse" set forth in FL, section 5–701(b), which was quoted at the beginning of this opinion. Deleting the language not here germane, that statute defines "abuse" as the "physical or mental injury of a child by any parent ... under circumstances that indicate the child's health or welfare is harmed or at substantial risk of being harmed ." As can be seen, a requisite for meeting the

requirements of this definition is a finding of "physical or mental injury." The trial judge did not find that Jessica suffered any physical or mental injuries as a result of her mother's acts, nor would such a finding have been justified based on the evidence produced at the August 16, 1999, hearing.

Because there was no evidence to support the court's finding of abuse, the trial judge erred in signing the protective order of August 16, 1999.

**JUDGMENT REVERSED;**

**COSTS TO BE PAID BY APPELLEE.**